TOM JOHNSON v. THE STATE.

No. 3550.   Decided March 7, 1906.

1.—Assault to Murder—Stenographer's Transcript—Transcript by Clerk—Costs
    —Rules of Supreme Court—Constitutional Law.

The rules of the Supreme Court which provide that the statement of fact shall be copied in the record, were made before the Act of the Twenty-ninth Legislature was passed providing for a stenographic report of the testimony taken on the trial; and where an original stenographer's transcript was sent up as the record of the case of the testimony therein, it took precedence over the transcript prepared by the clerk of the trial court, which was without authority and the costs for making it must be taxed against him. Under the constitution the rules of the Supreme Court when inconsistent with the legislative enactment, must yield to such enactment, and it is only when the stenographic transcript is not

sent up that the provisions of this act do not apply, and the rules prescribed by the Supreme Court would apply.

**2.—Charge of Court—Instrument Used to Produce Death—Intent.**

Where upon trial for assault with intent to murder, the evidence showed a sudden quarrel, after which the parties clinched and the defendant cut the injured party with a small knife, according to his statement to get loose from him, etc., the court should have given in charge the provisions of article 717, Penal Code, and substantially contained in defendant's requested instruction, that the instrument used if one not likely to produce death, intent to murder was not presumed but must be proved from the nature of its use, etc., and that there must be an intent to kill, etc., to convict of assault to murder.

Appeal from the District Court of Boxar.   Tried below before the Hon. Edward Dwyer.

Appeal from a conviction of assault with intent to murder; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*R. L. Watkins* and *C. C. Dodd,* for appellant.

*James Reutledge,* for District Clerk.

*Howard Martin,* Assistant Atorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—This conviction was for an assault with intent to murder.   Preliminary to disposing of the case upon the merits on the questions involved on the appeal, we notice that the Assistant Attorney-General has filed a motion to strike from the transcript a statement of facts copied therein by the clerk; and the further motion to charge the costs of copying this statement of facts in the transcript against the clerk making out the transcript.   This is resisted by the clerk, who insists that the act of the Legislature is unconstitutional because violative of the rules of the Supreme Court.   This position of the clerk is not well taken.   The Constitution provides that the Supreme Court may provide rules of procedure not inconsistent with the laws of the State.   The rules of the Supreme Court which provide that the statement of facts shall be copied in the record were ordered before the act of the Legislature was passed.   By the terms of this act of the Legislature (see Acts 29th Leg., p. 220) provision is made, for a stenographic report of the testimony taken on the trial.   It is further provided, in section 5 of that act that when the appeal is taken from the judgment rendered in the case, the original stenographer's transcript shall be sent up as the record of said cause as the report of the testimony therein, the costs of such transcript paid by either party, to be taxed against the party losing on such appeal.   "And no other record of said testimony shall be sent up on appeal; provided, any original documentary evidence, sketches, maps, plats, or other matters introduced in evidence, and if embraced in the stenographer's report, may be made a part of the record of said cause by written direction of the court, which may be

sent up in the original form if requested by either party to the suit, or transcribed by the clerk with other parts of the record therein; provided, that in any case where such stenographic transcript is not made, this act shall not apply. Provided, that in criminal cases where the defendant is convicted of a felony, and desires to appeal, upon a satisfactory showing to the court that he is unable to pay for the stenographer's transcript that the judge of the court in which said defendant is convicted, shall order the official stenographer to make the same for the defendant, in which event the same shall be paid for at the rate provided for in this act, and in the same manner as the transcript of the clerk of the court is paid for." The following section of the act provides, that after the final disposition of the case on appeal, the stenographer's report, with all of the original evidence, shall be returned to the clerk of the district court from which the appeal was taken. It will be seen that this act of the Legislature is inconsistent with the rules of the Supreme Court, wherein the stenographer's report of the evidence and the other matters are required to be sent up on appeal. It is unnecessary to discuss any other phase of this act, except as applicable to this motion. Under the Constitution, it will be seen that where the rules are inconsistent with legislative enactment, such enactment shall be superior to the rules of the court. One of the provisions of this act as quoted, provides that the stenographer's transcript of the testimony or the record made by the stenographer in taking down the testimony, when such testimony is sent up as prepared by the stenographer, shall constitute exclusively the record in regard to that matter on appeal; and that it is only when such transcript is not sent up that the provisions of this act do not apply. When the provisions of this act are not made to apply, and the stenographer's report is not sent up, then the rules as prescribed by the Supreme Court would apply. We are therefore of opinion that the motion of the Assistant Attorney-General is well taken; and that the transcript of this evidence as contained in the record sent up, should not have been included, and we can only look to the stenographer's report of such evidence which accompanies the transcript. Therefore, the clerk should not have transcribed the testimony into the record made out by him, as he was without authority to do so by the express terms of the statute. He will therefore not be entitled to the costs as to this portion of the transcript, and this cost is taxed against him.

As to the merits of the case, there is one question which in our judgment necessitates a reversal. Appellant asked the following instruction, which was refused: "If you believe that the instrument used is one not likely to produce death, intent to murder is not presumed, but must be proved from the nature of its use, or by specific proof. Where an assault occurs under the influence of sudden passion, or by the use of means not in their nature calculated to produce death, the person assaulting is not deemed guilty of assault to murder, unless it appears

that there was an intention to kill, but he should be convicted of a lower grade of assault and battery." A bill of exceptions was reserved to the refusal of the court to give this charge. In brief, the facts bearing upon this question show that appellant and the assaulted party, Chapman, were both in the employ of Steves & Company, lumber dealers in San Antonio, and had been for sometime. Appellant had been promoted from an ordinary laborer in the yards to the position of driver of one of the delivery wagons. On the occasion in question he had pulled a couple of planks from a pile of lumber, and was expostulated with by Chapman, the assaulted party, in a rather rough and insulting manner. Chapman testified in regard to this: that he was one of the clerks, and appellant was under the "order" of the clerks; that is, he was a subordinate. "When he (appellant) came down from the stack, I said, 'You are too damn lazy to take it from the right place.' He said, 'Mind your own business.' I said, 'That is our business, and that's why he (Steves) has us here—to look after his interests.' He went around the lumber stack and said, 'You attend to your own business and I'll attend to mine,' and then he went on mumbling. I went around the stack and he had a rock in his hand about the size of an ordinary tea cup and he then threatened me. He said, 'Don't come near me.' I said, 'If you want to fight put down that rock, you are nothing but a damn coward.' I was backing off and said, 'We will go and see the foreman about this.' He was in front of me and threatened me with a rock only to let me go a certain distance." It seems that this whole trouble came up as to whether these two particular pieces of lumber should be taken from one stack of lumber or from another. Appellant testified: "I drove up in front of the the stack and Mr. Chapman, Mr. Brown and Mr. Bartlett were together. They were loading a wagon not very far from where I went to get the two boards. I stopped the horse and went up on the stack and started shoving off two boards. Chapman said, 'Don't get those boards from there; go in the rear and get the boards. Mr. Steves will be raising hell with us for getting those boards.' I said 'I only want two.' By that time I had shoved them down. When he said that to me I had started shoving the boards down, when he first halloaed to me; and it was impossible for me to pull them back. I said, 'I only wanted two,' and I was going down. By that time he said, 'By God, Mr. Steves pays us to watch you damned niggers, and he'll be giving us hell about it.' I said, 'No, if Mr. Steves raises any sand, it will be with me.' By that time I was down and attempted to pick up the boards and Mr. Chapman came around and says, 'Don't give me your damned sass.' I picked up two rocks and said, 'Don't come up on me,' and he said, 'You God damned big coward, I ought to blow your head off.' By that time I walked down to where the foreman was; he was doing something; got down to where he was and attempted to tell him, when Mr. Chapman jumped on me and struck me right here (indicates) under the nose. By that

time Mr. Nagel grabbed me, and I had rocks in my right hand and a knife in my left hand, and Mr. Nagel grabbed my right hand when he struck me,—he grabbed this right hand and I had only the use of my left arm left, and I cut him, and when I cut him I turned around. But before I cut him, Mr. Nagel said to Mr. Chapman, 'Let him alone,' and afterwards said to Chapman, 'I told you to let him alone.' I said to Mr. Nagel, 'Turn me loose,' and I went on around back of the yard towards Mr. Schertz' planing-mill." The evidence shows that he hid himself for two or three days, and finally surrendered to the officers. Testifying further, appellant said: "I never had been in trouble before in all my life; never in a scrap with anybody, and never was arrested or anything of that kind, and after I had the fight with Mr. Chapman and Mr. Nagel I was very much excited and I left as I was afraid. I did not know, I thought he might have had a pistol by him saying, 'I ought to blow the top of your head off.' I didn't want to stay there any longer." Speaking further in regard to the immediate transaction in which the cutting occurred appellant said, when asked why he did it: "I had no chance to get loose; Mr. Nagel had hold of me, and Mr. Chapman also struck me, and I had no chance to get loose at all. If Mr. Nagel didn't have hold of me I never would have cut him; I could easily have run backwards. Mr. Nagel grabbed me at the time Mr. Chapman struck me, and I didn't have a chance to move, turn loose or anything, and he didn't turn me loose until I cut Chapman." In regard to the size of the knife, appellant says, "I could not exactly tell, but that it was not very large, about that length (indicating) the handle of it being two or two and one-half inches." The testimony as to the size of the knife is not satisfactory. Nagel testified that he saw the knife in appellant's hand, and that the blade was about two and one-quarter or two and one-half inches in length. Appellant testified that it was a little knife, as did some of the other witnesses; that he had bought and used it for the purpose of getting splinters out of his hand caused by handling rough lumber. Chapman (the assaulted party) had used appellant's knife for the same purpose. From the testimony of some of the witnesses it is shown that the blade was about one and three-quarters or two inches in length. These parties were more familiar with the knife than Nagel. Nagel had no knowledge of the knife, except as he saw it in appellant's hand as he walked away after cutting Chapman. So we have a description of the knife handle as being two or two and one-half inches in length, and the blade of the knife from one and three-quarters to two and one-half inches in length. Chapman's testimony is to the effect that he did not strike appellant with his fist on the nose or about his face; that while talking with Nagel about the trouble, he and appellant had had about the boards of lumber, appellant approached him, and they clinched; and while in that condition, appellant cut him in the back. using the knife in his left hand. Appellant was right-handed. It is

Vol. 49 Crim.—28.

beyond any question that the parties were clinched at the time of the cutting, and that Chapman was cut in the back, and appellant used the knife in his left hand. Nagel says he was pulling appellant away from Chapman, while appellant says, he was holding him by the right hand, and as Chapman had him clinched he could only use his left hand which he did, with the knife, cutting Chapman in the back; that he only cut once and could have cut oftener if he had seen proper to do so. We think it reasonably appears he could have used his knife oftener. The evidence shows that appellant was a negro, and Chapman, Nagel and Brown were white men. Under this state of facts, we believe that the provisions of article 717, Penal Code, should have been given in charge to the jury, and the court erred in refusing to give the special requested instruction, which, in substance, submits the provisions of said article. Lee v. State, 72 S. W. Rep., 195; Sullivan v. State, 18 S. W. Rep., 791; Martinez v. State 35 Texas Crim. Rep., 386; Shaw v. State, 34 Texas Crim. Rep., 354; Baker v. State, 10 Texas Ct. Rep., 976. Article 717 provides, "The instrument or means by which a homicide is committed are to be taken into consideration in judging of the intent of the party offending. If the instrument be one not likely to produce death, it is not to be presumed that death was designed, unless from the manner in which it was used such intention evidently appears." We believe the facts of this record call for a charge under this article.

It is insisted that the court should have granted a continuance. It is not necessary, in view of the disposition made of the appeal, to discuss this matter.

For the error indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*